1

2

3

4

5

6

7

8

9

10

11

12

**E-Filed 12/9/08**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

13

14

15

16

17

18

19

20

21

22

JAMES M. KELLEY, MIKI LARSSON, and
DOUGLAS B. KELLEY,

Plaintiffs,

v.

RAMBUS, INC., PRICEWATERHOUSE
COOPERS, LLP, GEOFFREY TATE, DAVID
MOORING, PAUL MICHAEL FARMWALD,
BRUCE S. DUNLEVIE, WILLIAM DAVIDOW,
and ROBERT EULAU,

Defendants.

Case Number C 07-1238 JF (HRL)

**ORDER[1] GRANTING MOTIONS
TO DISMISS**

Re: Docket Nos. 209, 210, 214, 215 &
219

23

24

25

26

## I. BACKGROUND

In this consolidated action for violations of sections 14(a) and 18(a) of the Securities and

Exchange Act of 1934 ("Exchange Act"), Plaintiffs James Kelley, Douglas Kelley, and Miki

Larsson ("Plaintiffs") allege that Rambus, Inc., through a number of its current and former

27

28

---

[1] This disposition is not designated for publication in the official reports.

directors and officers ("Defendants"), engaged in and concealed an extensive pattern of options backdating.  The original complaint, filed by James Kelley and Larsson on March 1, 2007, contained additional claims under federal securities laws and under California and Delaware law.  James Kelley and Larsson subsequently filed three amended complaints, and Plaintiff Douglas Kelley filed a separate complaint on May 8, 2007, which he later amended.  After the Court consolidated the cases on June 25, 2007, Plaintiffs filed a 295-page complaint that the Court dismissed for non-compliance with Federal Rule of Civil Procedure 8(a).  With leave of Court, Plaintiffs filed an amended complaint on November 13, 2007, alleging violations of sections 10(b), 14(a), 18(a), and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act"), as well as common law fraud.  Defendants subsequently filed motions to dismiss the amended complaint.  On April 17, 2008, the Court granted the motions and granted Plaintiffs further leave to amend, but only as to their claims under sections 14 and 18 of the Exchange Act ("April 17, 2008 Order").  On May 15, 2008, Plaintiffs filed a pleading that restated allegations previously dismissed with prejudice in the April 17, 2008 Order.  The Court accordingly struck the entire pleading by minute order on May 16, 2008.  Plaintiffs then filed their Second (Revised) Consolidated Amended Complaint ("SRCAC"), which is now before the Court.

The remaining § 14 and § 18 claims stem from Defendants' alleged failure to disclose options backdating, allegedly occurring from 1997 through at least 2003, in the company's 2005 and 2006 proxy statements and in its 2005 10-K.[2]  Plaintiffs allege that Rambus, current directors P. Michael Farmwald ("Farmwald"), William Davidow ("Davidow"), and Bruce Dunlevie ("Dunlevie"), and outside auditor PricewaterhouseCoopers ("PwC"), are responsible for the issuance of materially false proxy statements, in violation of § 14(a).  Plaintiffs also allege that these same defendants, as well as former CFO Robert Eulau, former CEO Geoff Tate, and former president and director David Mooring made material misstatements or omissions in

---

[2] Plaintiffs refer intermittently to Rambus's 2004 10-K, but the Court already has determined that claims arising from this statement, filed on February 13, 2004, are barred by the applicable three-year statute of repose.  *See* April 17, 2008 Order at 8.  Plaintiffs also refer to the 2004 proxy statement, but they make no attempt to plead reliance on any but the 2005 and 2006 proxy statements.  *See* SRCAC ¶¶ 117-124.

2

1  documents filed with the SEC, in violation of § 18.

2      Defendants move to dismiss the complaint for failure to state a claim upon which relief

3  may be granted.  After a thorough review of Plaintiffs' voluminous pleadings and supporting

4  documents, the Court agrees with Defendants that Plaintiffs have not stated a claim under

5  sections 14(a) or 18(a).  The Court also is convinced that there is no realistic possibility that

6  Plaintiffs could cure the deficiencies in their § 14 claim.  Finally, while there may be at least a

7  theoretical possibility that Plaintiffs could state a viable § 18 claim, the Court is satisfied that in

8  light of Plaintiffs' repeated failure to address identified deficiencies in their pleadings, the

9  numerous inconsistencies in the allegations they do offer, and the continuing prejudice to

10  Defendants, leave to amend that claim should be denied as well.

11                    **II. APPLICABLE LEGAL STANDARDS**

12  **A.    Dismissal under Federal Rule of Civil Procedure 12(b)(6)**

13      A complaint may be dismissed for failure to state a claim upon which relief may be

14  granted for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts

15  under a cognizable legal theory.  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34

16  (9th Cir. 1984).  For purposes of a motion to dismiss, all allegations of material fact in the

17  complaint are taken as true and construed in the light most favorable to the nonmoving party.

18  *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir. 1994).   A complaint should not be

19  dismissed "unless it appears beyond doubt the plaintiff can prove no set of facts in support of his

20  claim that would entitle him to relief."  *Clegg*, 18 F.3d at 754.  However, a plaintiff is required

21  to provide "more than labels and conclusions," *Bell Atl. Corp. v. Twombly*, __ U.S. __, 127

22  S.Ct. 1955, 1964 (2007), and the "[f]actual allegations must be enough to raise a right to relief

23  above the speculative level."  *Id*. at 1965.

24  **B.    Allegations of Fraud under Federal Rule of Civil Procedure 9(b)**

25      Defendants argue that the entirety of Plaintiffs' complaint is subject to Federal Rule of

26  Civil Procedure 9(b), which requires that claims sounding in fraud be pled with particularity.

27  Plaintiffs contend that, except as to their concededly fraud-based § 18(a) claim against PwC, the

28  applicable pleading standard is set forth in Rule 8(a)–requiring only a "short and plain

3

1    statement" of the claim–as neither § 14 nor § 18 requires a showing of fraud.  The Ninth Circuit

2    has held that "in a case where fraud is not an essential element of a claim, only allegations

3    ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of Rule

4    9(b).  Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading

5    standards of Rule 8(a)."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104-05 (9th Cir.

6    2003).  Accordingly, unless the plaintiff alleges a "unified course of fraudulent conduct," such

7    that the entire claim is "grounded in fraud," only the allegations of fraud must be pled with

8    particularity.  *Id*. at 1103-04.  Where a plaintiff does allege a unified course of fraudulent

9    conduct, the Court "is not required to sift through allegations of fraud in search of some 'lesser

10    included' claim"–for example, one sounding in negligence.  *In re Daou Systems, Inc.*, 411 F.3d

11    1006, 1028 (9th Cir. 2005).  However, "[w]here averments of fraud are made in a claim in

12    which fraud is not an element, an inadequate averment of fraud does not mean that no claim has

13    been stated.  The proper route is to disregard averments of fraud not meeting Rule 9(b)'s

14    standard and then ask whether a claim has been stated."  *Id*. at 1105 (quoting *Lone Star Ladies*

15    *Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir.2001)).

16        In light of the above standards, the Court must determine the applicability of Rule 9(b)

17    by examining the actual substance of the pleadings, *see Vess*, 317 F.3d at 1103-05; *Desaigoudar*

18    *v. Meyercord,* 223 F.3d 1020, 1022-23 (9th Cir. 2000), notwithstanding Plaintiffs' purported

19    "disavow[al of] any allegations of fraud,"  SRCAC ¶¶ 148, 165.  In this instance, Plaintiffs'

20    allegations as to all defendants, and as to both of their remaining claims, are replete with

21    language associated with fraud.  *See, e.g.*, SRCAC ¶¶ 29, 34, 39, 40, 67.[3]  Plaintiffs have

22

23        [3] The relevant allegations are as follows: SRCAC ¶ 29 ("[T]he board of directors
24    disguised the return of backdated options to Mr. Tate."), ¶ 34 ("The Company, with the
     knowledge, approval, and participation of each of the Rambus Defendants, disseminated its false
25    financial statements in, *inter alia*, the *audited* Form 10-K filings . . . "), ¶ 39 ("The Human
     Resources Department . . . , at the behest of the Stock Options Committee, forged the Stock
26    Option Committee Memoranda to conceal the backdating as admitted by Rambus.  At other
     times, Tate (the sole member of that Committee) falsified the Stock Option Committee
27    Memoranda to conceal the backdating."), ¶ 40 ("For the remaining instances of falsification, the
     Compensation Committee prepared the falsified grant documents. . . .  The Compensation

28

4

1    "incorporated, indiscriminately, all their allegations of fraud into the claims." *In re Enron Corp.*

2    *Sec., Deriv. & ERISA Litig.*, 540 F. Supp. 2d 800, 827 (S.D. Tex. 2007); SRCAC ¶¶ 148 & 165

3    (incorporating all allegations, including allegations of fraud, into the claims).  Plaintiffs thus

4    have alleged the "continuous course of fraudulent conduct" contemplated in *Vess*, and their

5    entire complaint must comport with Rule 9(b).  *Vess*, 317 F.3d at 1103-05.  Consistent with

6    *Vess*, even if certain allegations fail the Rule 9(b) standard, the Court also must assess whether

7    the remaining allegations state a claim under § 14 or § 18, neither of which requires a showing

8    of fraud.  *Id.*

9    **C.    The Private Securities Litigation Reform Act ("PSLRA")**

10          Plaintiffs also must comply with the requirement of the PSLRA that the complaint "state

11   with particularity facts giving rise to a strong inference that the defendant acted with the

12   required state of mind." 15 U.S.C. § 78u-4(b)(2); *Desaigoudar*, 223 F.3d at 1023 (applying

13   PSLRA pleading standards to section 14(a) claims); *In re Verisign, Inc., Derivative Litig.*, 531

14   F. Supp. 2d 1173, 1202-1203 (N.D. Cal. 2007) (same); *In re Zoran Corp. Derivative Litigation*,

15   511 F. Supp. 2d 986, 1015 (N.D. Cal. 2007) (same); *see also Deephaven Private Placement*

16   *Trading Ltd, v. Grant Thornton & Co.*, 454 F.3d 1168, 1172 (10th Cir. 2006) (applying PSLRA

17   to § 18(a) claims); *In re Stone & Webster, Inc., Securities Litigation*, 414 F.3d 187, 194 (1st Cir.

18   2005) (same).  Under the PSLRA, "[i]t is not sufficient for a plaintiff's pleadings to set forth a

19   belief that certain unspecified sources will reveal, after appropriate discovery, facts that will

20   validate her claim." *South Ferry LP, No. 2 v. Killinger*, __ F.3d __, 2008 WL 4138237, at *4

21   (9th Cir. 2008) (quoting *Silicon Graphics*, 183 F.3d 970, 985 (9th Cir. 1999)).[4]

22

23   Committee at that time was comprised of Davidow, Dunlevie, Geschke, and later Farmwald. . .
     "), ¶ 67 ("Davidow, Dunlevie, and Geschke also controlled the Audit Committee and had to meet

24   with PwC and prepare the 10-K annual report.  The October 16 backdated option grants . . . were

25   intentionally and falsely put into the annual report for the fiscal year ending September 30,
     2001.")

26          [4] In light of the Supreme Court's decision in *Tellabs, Inc. v. Makor Issues and Rights,*

27   *Ltd.*, __ U.S. __, 127 S.Ct. 2499, 2510 (2007), the Ninth Circuit in *Killinger* revisited several
     prior holdings interpreting the PSLRA, but it did not purport to alter this aspect of the pleading

28   standard articulated in *Silicon Graphics*.

1    The required state of mind for § 14 claims is negligence. *Verisign,* 531 F. Supp. 2d at

2  1211. Section 18, while requiring "something more than negligence," *Ernst & Ernst v.*

3  *Hochfelder*, 425 U.S. 185, 211 n.31 (1976); *In re Fed. Nat'l Mortg. Ass'n Sec., Deriv., and*

4  *ERISA Litig.*, 503 F. Supp. 2d 25, 44 (D.D.C. 2007), gives Defendants the burden of showing

5  that they acted "in good faith and had no knowledge that [a] statement was false or misleading,"

6  and Plaintiffs initially are required to plead no more than facts giving rise to a strong inference

7  of negligence. *See, e.g.*, *Magna Inv. Corp. v. John Does One Through Two Hundred*, 931 F.2d

8  38, 39-40 (11th Cir. 1991) (holding that § 18 Plaintiff need only plead negligence, and that

9  Defendants must raise "good faith" as an affirmative defense); *In re Alstom* SA, 406 F. Supp. 2d

10  402, 420 (S.D.N.Y. 2005) ("[I]t is not the plaintiff's burden to anticipate and plead in his

11  complaint a rebuttal to the defendant's potential defense [of good faith]."); *see also Howard v.*

12  *Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (noting, under similar § 20 provision, that

13  "[p]laintiff need not show that the defendant was a culpable participant in the violation, but

14  defendant may assert a 'good faith' defense").

15                          **III. DISCUSSION**

16  **A.    Section 14(a) Claims**

17    To state a claim under §14(a) of the Exchange Act, a plaintiff must show that (1) the

18  defendant made a material misrepresentation or omission in a proxy statement, (2) the

19  misrepresentation or omission was made with the requisite level of culpability, and (3) the

20  misrepresentation or omission was an essential link in the accomplishment of a transaction

21  proposed in the proxy solicitation. *Desaigoudar*, 223 F.3d at 1022. Each of these

22  requirements–and the "essential link" requirement in particular–reflects the purpose of section

23  14(a), which is to prevent corporate management "from obtaining authorization for corporate

24  action by means of deceptive or inadequate disclosure of proxy solicitation." *J.I. Case Co. V.*

25  *Borak*, 277 U.S. 426, 431 (1964).[5]

26  ─────────────────

27      [5] As an initial matter, there remain substantial questions as to whether Plaintiffs can
     maintain their § 14 claim as a direct action. In dismissing Plaintiffs' § 14 claim, the Court

28  previously noted that the claim as pled appeared derivative rather than direct. April 17, 2008

                                6

1          **1.     Material misstatements or omissions**

2          Although Plaintiffs' allegations are at times difficult to follow, the SRCAC appears to

3   allege four material misstatements or omissions with respect to Rambus and the director and

4   officer defendants.  First, Rambus is alleged to have represented falsely in its 2005 and 2006

5   proxy statements that "[u]nless otherwise indicated, options were granted at an exercise price

6   equal to the fair market value of the Company's Common Stock at the date of grant."  SRCAC

7   ¶¶ 30, 53.  The 2006 proxy statement, however, simply does not contain such a representation,

8   and therefore cannot support Plaintiffs' claims.  While the representation does appear in the

9   2005 proxy statement, it refers exclusively to grants made in 2004.  Defendants contend that the

10  SRCAC cannot be read to challenge any backdating after 2003, and that a representation

11  concerning options grant procedures in 2004 thus is irrelevant.  The SRCAC, however, does

12  contain scattered allegations of backdating in 2004.  *See* SRCAC ¶ 38 ("This new hire

13  backdating continued into December 2004."), ¶ 53 (noting unspecified backdated grants in

14  December 2004); *id*. at 181, Ex. C-3 (containing a chart purportedly summarizing options

15  backdated through October 12, 2004).  Plaintiffs noted at oral argument that Rambus admitted to

16  such backdating in the September 14, 2007 restatement of its 2006 10-K, albeit without

17  identifying the grantees or any other details.  Plaintiffs contend that without discovery they

18  cannot yet determine whether the backdated options were granted to any of the named

19  defendants.  Transcript at 3:9-5:15.  However, as noted above, a plaintiff may not merely "set

20  forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that

21  will validate her claim," *South Ferry LP, No. 2 v. Killinger*, __ F.3d __, 2008 WL 4138237, at

22

23  Order at 7:13-26.  To maintain a direct claim, a stockholder must allege that he suffered an injury
    separate and distinct from any harm suffered by the corporation, and that he, not the corporation,
24  would receive the benefit of a remedy.  *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d
    1031, 1035 (Del. 2004).  Plaintiffs' Opposition (Doc. No. 242, at 5:13-19) appears to place
25  exclusive reliance on the theory–not contained in any pleading–that the section 14(a) claim is
    direct because the 2006 proxy statement sought and won ratification of the 2006 Equity Incentive
26  Plan and Employee Stock Plan, which proposed to authorize an additional 10% dilution of
    Rambus capital stock.  But it is well established that equity dilution "does not generally
27  constitute a direct harm, but a derivative one."  *Oliver v. Boston Univ.*, 2006 WL 1064169, at *16
    (Del. Ch. Apr. 14, 2006).
28

7

1    *4 (9th Cir. 2008).[6]

2         Second, Plaintiffs allege that Rambus falsely represented in its 2005 and 2006 proxy

3    statements that its "1997 Stock Plan ha[d] been . . . administered to meet [the] requirement[s]"

4    of § 162(m).  SRCAC ¶ 53.  Although Plaintiffs' pleadings once again are not entirely clear, it

5    appears that Defendants' alleged non-compliance with § 162(m) flowed from both (1) an alleged

6    conflict of interest arising from Farmwald's simultaneous service on the Compensation

7    Committee and as a director; and (2) the backdating itself, since 162(m) prescribes rules for the

8    deductibility of compensation.  Neither of these statements comports with the particularity

9    requirements of the PSLRA.  Farmwald was not a member of the Compensation Committee in

10   2004 or 2005, SRCAC ¶ 52, and Plaintiffs do not explain how Farmwald's previous service on

11   the Committee supports the alleged falsity of the 2005 proxy statement.  Moreover, the

12   representation at issue refers to the Compensation Committee's work in 2004 and 2005 (the

13   periods covered by the 2005 and 2006 proxy statements).  Because Plaintiffs do not allege

14   backdating in 2005, the representation in the 2006 proxy statement is irrelevant.  To the extent

15   the challenged backdating ceased in 2003, the representation in the 2005 proxy statement also is

16   irrelevant.  Because Plaintiffs' allegations of backdating in 2004 are conclusory and unsupported

17   by particular facts, neither representation, as currently pled, can support liability, and the only

18   question is whether further details concerning the alleged 2004 backdating could render the

19   representation actionable.

20        Third, Plaintiffs allege that Rambus "materially overstate[d]" fiscal year end values of

21   unexercised in-the-money options.  SRCAC ¶¶ 123-24.  This allegation, however, is

22   unsupported by any reference to particular options, the amount by which the exercise prices

23   were understated, or the extent of overvaluation.  As such, it falls far short of the PSLRA's

24

25        [6] Plaintiffs recently filed what they claim is evidence of backdating accomplished by the
     Compensation Committee–and in particular by defendants Larson and Dunlevie–in October
26   2004.  The Court expresses no opinion as to whether this evidence would allow Plaintiffs to
     allege backdating in 2004 with the requisite particularity.  *See* Declaration of James Kelley, filed
27   Nov. 16, 2008 (attaching "a Rambus internal document" purportedly showing that specific acts
     of backdating occurred in 2004).

28

                                                    8

demanding standard with respect to the context of alleged misrepresentations or omissions.  In

addition, as Defendants point out, an overstatement of the value of "in-the-money" options

would mean that Rambus's compensation expenses for 2004 and 2005 would have been

overstated.  Logically, such overstatement would mean that the price of Rambus stock

purchased by Plaintiffs was deflated rather than inflated.

Fourth, Plaintiffs allege that both proxy statements were false because they were

accompanied by allegedly false financial statements, such as Rambus's 10-K filings.  This theory

is wholly unpersuasive.  Although provided as a courtesy with the proxy statements, the

financial statements cannot be considered part of the proxy statements for § 14(a) purposes

unless they are specifically incorporated therein.  *See, e.g.*, *Hulliung v. Bolen*, 548 F. Supp. 2d

336, 340-41 (N.D. Tex. 2008) ("Inaccuracies in an annual report cannot form the basis for proxy

fraud liability unless the annual report is specifically incorporated into proxy materials.");

*Markewich v. Adikes*, 422 F. Supp. 1144, 1147 (E.D.N.Y. 1976) ("Absent a specific declaration

of incorporation, a mere mention of the annual report does not incorporate it by reference . . .;

otherwise, an annual report would automatically be incorporated by reference in any proxy

statement which ever recognized the existence of, or merely accompanies, an annual report.");

*Stricklin v. Ferland*, No. Civ. A-98-3279, 1999 WL 89694, at *2 (E.D. Pa. Jan.19, 1999)

("Flaws in annual reports are not actionable under Rule 14a-9 unless the issuer specifically

requests that they be treated as part of the proxy material or incorporated them into the materials

by reference.").  The 2005 and 2006 proxy statements merely noted–as is customary–that copies

of the financial statements could be obtained from Rambus free of charge.  They did not

"incorporate" the accompanying annual reports.

With respect to PwC, Plaintiffs attempt to state three theories of § 14(a) liability: (1) that

the inclusion of PwC audit opinions with Rambus's 10-K forms constituted a misstatement or

omission by PwC in the proxy statements, since the 10-K forms were included with the proxy

statements; (2) that PwC permitted the use of its name in the proxy statements; and (3) that PwC

had a duty to "affirmatively permit" the use of its name in the proxy statements, and that its

silence therefore amounts to "permission" to use its name.  Each of these theories is

9

fundamentally unsound.  First, because the 10-Ks themselves were *not* "incorporated" into the proxy statements, Plaintiffs' doubly attenuated theory with respect to PwC fails *a fortiori*. Second, "the reach of section 14(a) could not possibly extend so far" as to make the mere appearance of a party's name in a proxy statement the basis for that party's liability, *Yamamoto v. Omiya*, 564 F.2d 1319, 1322-23 (9th Cir. 1977) (rejecting plaintiff's § 14 claim because "[t]he mere presence of [defendant's] name in the [proxy] materials . . . [does] not reveal any significant control by [the defendant] over the statement, or his adoption of it"), and neither the SRCAC nor its voluminous supporting materials contains any indication that PwC affirmatively "permitted the use of its name" in a manner sufficient to associate it with the proxy statements.

Finally, as to Plaintiffs' argument that PwC had a duty affirmatively to permit the use of its name,[7] there is no authority holding that § 14 creates liability for those not involved in the drafting or review of proxy statements merely by virtue of their silence.  *See N.J. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1148-49 (D. Kan. 2004) (refusing to hold outside auditor liable for omissions in a proxy statement since, without making any representations, an auditor has no general duty to disclose any information in the proxy statement, even where the proxy statement sought shareholder ratification of the auditor).  In short, Plaintiffs have failed to allege a material misstatement or omission in the proxy statements by PwC or the Rambus Defendants, and their allegations with respect to the latter can be saved only by further particularized evidence of 2004 backdating.

### 2.    Strong inference of Defendants' negligence

The PSLRA's requires that Plaintiffs plead facts creating a "strong inference" of Defendants' negligence.  The inference must be "cogent and compelling, thus strong in light of other explanations." *Tellabs*, 127 S.Ct. at 2510.  In that regard, Plaintiffs "must plead particular facts as to *each defendant's* negligence." *In re Zoran*, 511 F. Supp. 2d at 1015 (emphasis added).  This standard raises two issues in this case: first, whether a defendant "made" a

---

[7] This theory appears for the first and only time in Plaintiffs' oppositions to the instant motions to dismiss.

1   particular statement in a corporate document, and second, whether that defendant did so with the

2   required mental state.  Previously, the so-called "group pleading" doctrine permitted an

3   inference that certain documents and statements were the collective work of individuals with

4   "direct involvement" in high-level operations.  *In re Pfizer Inc. Sec. Litig.*, __ F.R.D. __, 2008

5   WL 2627131 (S.D.N.Y. July 1, 2008).  The group pleading doctrine was eliminated by the

6   PSLRA.  *See, e.g.*, *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142 (C.D. Cal.

7   2007).  However, an officer or director who *signs* a document is deemed to have "made" all of

8   the statements therein.  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061-63 (9th Cir. 2000).

9   While signing a document typically does not establish that the officer or director acted with the

10  requisite mental state, *Howard* involved claims requiring scienter, and it has been suggested that

11  the *Howard* rule alone could support liability in claims requiring only negligence.  *See, e.g.*,

12  *Enron*, 540 F. Supp. 2d 800, 825 n.29, 813-14 (S.D. Tex. 2007) (explaining that the holding in

13  *Howard* was premised on the signing defendants' scienter, but that the *Howard* rule alone

14  supports liability in the context of negligence claims).

15      Even if a defendant did not sign a particular document, a court may, in limited

16  circumstances, infer the "making" of a statement with the requisite mental state from that

17  defendant's position in the corporation.  The Ninth Circuit recently addressed the availability of

18  this so-called "core operations inference" in *South Ferry LP, No. 2 v. Killinger*, 2008 WL

19  4138237 (9th Cir. 2008).  In light of the Supreme Court's holding in *Tellabs*, the court

20  concluded that "the core-operations inference can be one relevant part of a complaint that raises

21  a strong inference" of the required mental state."  *Id.* at *5.  Accordingly, "a series of less

22  precise allegations [may] be read together to meet the PSLRA requirement[s]," such that

23  "[v]ague or ambiguous allegations are now properly considered as a part of a holistic review

24  when considering whether the complaint raises a strong inference" of the requisite mental state.

25  *Id*.  The Ninth Circuit also held that without "additional detailed allegations about the

26  defendants' actual exposure to information, it will usually fall short of the PSLRA standard"

27  with respect to *scienter* under § 10(b).  *Id.*; *see also Metzler Inv. GmbH v. Corinthian Colleges,*

28  *Inc.*, 534 F.3d 1068, 1087 (9th Cir. 2008) (holding that bare core-operations inference failed to

11

1    meet *Tellabs* standard).  However, the court has not so held with respect to negligence under §

2    14, and presumably far less is required when Plaintiffs invoke the core-operations inference

3    merely to establish negligence.

4        In the instant case, this Court already has narrowed the scope of potential

5    misrepresentations or omissions to the possible falsity of representations concerning Rambus's

6    options grant practices contained in the 2005 proxy statement.  Because the 2005 proxy

7    statement was signed "on behalf of the board of directors," *Howard* permits the Court to assume

8    that each of the then-directors "made" the alleged representations.  Davidow, Dunlevie,

9    Farmwald, Tate, and Mooring were directors at the time the 2005 proxy statement was released,

10   *see SRCAC* ¶¶ 14-18, and the representations therein can be attributed to these defendants.

11   Moreover, *Howard* may permit the Court to assume that Defendants made the representations

12   negligently, as explained above.  Even without the *Howard* rule, Plaintiffs may be able to invoke

13   the core-operations inference because of the presumably lower standard for applying it in the

14   context of negligence claims.  In that respect, the Court will give Plaintiffs the benefit of the

15   doubt.  It follows that, if Plaintiffs could provide more detailed facts regarding the alleged 2004

16   backdating, they might be able to establish a strong inference of Defendants' negligence as to

17   the 2005 proxy statement with the aid of *Howard* and the core-operations inference.

18       **3.    Essential link**

19       Section 14(a) plaintiffs must demonstrate that the misstatement or omission was an

20   "essential link in the accomplishment of the proposed transaction."  *Desaigoudar*, 223 F.3d at

21   1022 (emphasis added).  The essential link requirement can "only be established when the proxy

22   statement at issue *directly authorizes* the loss-generating corporate action."  *Hulliung v. Bolen*,

23   548 F. Supp. 2d 336, 341 (N.D. Tex. 2008) (emphasis added).  As noted earlier, this requirement

24   flows from the purpose of § 14(a), which is to prevent shareholder voting on the basis of

25   deceptive proxy solicitations.  *Borak*, 277 U.S. at 431.

26       The only actions put to shareholders by the 2005 and 2006 proxy statements were the

27   following: in 2005, the election of four Class II directors and ratification of PwC as independent

28   auditor; and in 2006, the election of 5 Class I directors, approval of the 2006 Equity Incentive

12

Plan, approval of the 2006 Employee Stock Purchase Plan, and ratification of PwC as independent auditor. *See* Rambus Notices of Annual Meetings of Stockholders, Decl. of Betty Chang Rowe, Exs. A & B. Plaintiffs attempt to state three theories of an "essential link" between the allegedly false proxy statements and a loss-generating corporate action authorized at the shareholder meetings.

Plaintiffs' first theory turns on Rambus's failure to disclose options grant practices that ceased in 2003 (or, as discussed previously, at the latest in 2004). This theory illogically postulates an "essential link" between the allegedly false proxy statements and corporate actions that occurred years earlier–i.e., the backdating. Several district courts recently have rejected § 14(a) claims based on such a theory. In *Hulliung v. Bollen*, 548 F. Supp. 2d 336 (N.D. Tex. 2008), plaintiffs asserted that the defendant company's proxy statements "were false or misleading because they failed to disclose the company's past backdating [of options]." *Id*. at 340. The court dismissed the claim, holding that, "[a]s a matter of common sense, the Proxies cannot be an essential link to harm caused by stock option backdating that occurred years prior to [the] Proxies' issuance." *Id*. Similarly, the court found it "simply illogical to suggest that Proxies could be an 'essential link' to–i.e., directly authorize–corporate actions that were taken three years or more *before* any of the proxies were distributed." *Id*. (emphasis in original). Similarly, in *In re iBasis, Inc. Deriv. Litig.*, 532 F. Supp. 2d 214 (D. Mass. 2007), plaintiffs brought a § 14(a) claim on the basis of alleged nondisclosure of backdating practices. There, too, the court dismissed the claim because any fallout associated with the backdating would have occurred regardless of disclosure, and because plaintiffs had failed to allege that any backdated options were issued *in connection with the challenged proxy statement*. *Id*. at 222-23. Finally, in *In re Asyst Techs., Inc. Deriv. Litig.*, No. C-06-04669 EDL, 2008 WL 2169021 (N.D. Cal. May 23, 2008), the court rejected a § 14 claim premised on a failure to disclose certain options backdating in a 2004 proxy statement because "[p]laintiffs ha[d] failed to allege that any *additional* backdated stock options were granted after the 2004 statement issued in July, and the last challenged grant occurred in April 2004." *Id*. at *9.

Indeed, future backdating, or the involvement of directors authorized by the proxy vote

13

in some future wrongdoing, has been critical in every case that has found an essential link. *See, e.g.*, *In re Zoran Corp. Deriv. Litig.*, 511 F. Supp. 2d 986, 1016 (N.D. Cal. 2007) ("If defendants had not falsely stated in Zoran's proxy statements that stock options were being granted properly under the plans, and that directors were complying with the terms of the plans that the shareholders approved, shareholders would have voted those board members out, and the board members would no longer have had the means *to grant more backdated stock options*.") (emphasis added); *In re Maxim Integrated Prods., Inc., Deriv. Litig.*, No. C 06-03344 JW, 2008 WL 4061075, at *13 (N.D. Cal. Aug. 27, 2008) (refusing to dismiss § 14(a) claim because "[d]efendants were at least negligent in preparing the proxy statements and that . . . negligence was an essential link in accomplishing *further backdating* transactions which harmed the Company) (emphasis added). By contrast, Plaintiffs in the instant case have "failed to allege . . . that any related–*but not essentially preexisting*–injury occurred after the shareholders approved the recommended action in the proxy statement." *In re iBasis*, 532 F. Supp. 2d at 223 (emphasis added).

Plaintiffs' second theory is that shareholder ratification of PwC as an outside auditor was an essential link in the perpetuation of Rambus's illicit options backdating, as a result of PwC's alleged audit failures and false audit opinions. This theory fails for the reasons already discussed, since Plaintiffs only have alleged backdating that occurred well before Rambus solicited PwC's ratification in the 2005 and 2006 proxy statements. Ratification of PwC as Rambus's auditor cannot have been an essential link to past backdating.

Plaintiffs' third theory is that Rambus's omission with respect to prior backdating in the 2006 proxy statement facilitated the passage of two stock plans at the 2006 shareholder meeting, which plans purportedly caused a decline in Rambus's stock price. *See* Pls.' Opp. to Rambus Mot. to Dismiss, at 23:18-22 ("Rambus' failure to disclose their backdating practices resulted in adoption of the two new stock plans at Rambus in 2006 alone and these plans called for an additional 10% dilution of Rambus capital stock with the consequent negative effect on Rambus stock price. Plaintiffs were damaged by the prospect of a further 10% capital stock dilution."). This theory–which appears for the first time in Plaintiffs' opposition to the instant motions to

14

1   dismiss–is the only one that *prospectively* implicates a loss-generating corporate action.  Yet

2   Plaintiffs offer no support for the proposition that the plans likely would not have been ratified

3   had the previous backdating been disclosed, *cf. id*. at 5 & n.13, nor do they allege any harm that

4   flowed from the "prospect" of a further dilution of Rambus stock.  This unsupported theory is a

5   transparent attempt shift attention from Rambus's historical backdating, which is the ultimate

6   wrong of which Plaintiffs complain.  That "essentially preexisting . . . injury," *In re iBasis*, 532

7   F. Supp. 2d at 223, cannot form the basis for § 14 liability.[8]  Because none of Plaintiffs' three

8   theories is adequate, Plaintiffs have failed to show that alleged misrepresentations or omissions

9   in the proxy statements were an essential link to a subsequent loss-generating action.

10  **B.    Section 18(a) Claims**

11          Section 18(a) creates a right of action in favor of any person who, "in reliance upon [a

12  false or misleading statement contained in a document filed with the SEC], shall have purchased

13  or sold a security at a price which was affected by such statement."  15 U.S.C. § 78r.  Thus, to

14  state a claim under § 18, "the plaintiff must plead that (1) a document filed pursuant to the

15  Exchange Act, or any rule or regulation promulgated under it, contained a false or misleading

16  statement; (2) the defendant made or caused to be made the false or misleading statement; (3)

17  the plaintiff actually relied on the false statement; and (4) that reliance caused loss to the

18  plaintiff." *Enron*, 540 F. Supp. 2d at 813.

19          **1. Statute of Limitations**

20          Section 18 contains a limitations period that expires one year from discovery of the

21  alleged violation.  15 U.S.C. § 78i-(e).  A large majority of courts have held that the Sarbanes-

22  Oxley statute of limitations found in 28 U.S.C. § 1658(b) did not extend the limitations period

23

24          [8] While the Court does not read Plaintiffs' papers to make such arguments, it is clear that
25  Plaintiffs may not claim that the re-election of the directors was an essential link to loss-
    generating corporate action because of the directors' subsequent mismanagement.  *See, e.g.*, *In re*
26  *Affiliated Computer Servs. Deriv. Litig.*, 540 F. Supp. 2d 695, 704 (N.D. Tex. 2007) ("The mere
    fact that omissions in proxy materials, by permitting directors to win re-election, indirectly led to
27  financial loss through mismanagement will not create a sufficient nexus with the alleged
    monetary loss.").
28

15

1   under § 18. *See, e.g.*, *In re Fed. Nat'l Mortg. Ass'n Sec., Deriv., and ERISA Litig.*, 503 F. Supp.

2   2d 25, 34-35 (D.D.C. 2007); *In re Alstom SA Secs. Litig.*, 406 F. Supp. 2d 402, 419-20

3   (S.D.N.Y. 2005).  In determining when the statute of limitations began to run in this case, the

4   Court first must ask when Plaintiffs had "inquiry notice" of the alleged fraud, and second, when

5   Plaintiffs in the exercise of reasonable diligence should have discovered the facts constituting

6   their claim.  *See Betz v. Trainor Wortham & Co.*, 504 F.3d 1017, 1024-25 (9th Cir. 2007).

7   Whether a plaintiff had inquiry notice and conducted a reasonable investigation frequently is a

8   factual question not suitable for resolution as a matter of law.  *See Betz*, 504 F.3d at 1026.  This

9   is particularly so "where the plaintiff alleges that the defendants' reassurances convinced the

10  plaintiff to postpone his or her legal action."  *Id*.  However, the question well may be suitable for

11  resolution as a matter of law where (1) the investor is "experienced" or "sophisticated"; (2) the

12  defendants made no reassurances; or (3) the "total[ity] [of] circumstances" otherwise indicates

13  that there are no disputed material facts.  *Betz*, 504 F.3d at 1025 n.4, 1027.

14          In addition, when the effect of the limitations period turns on whether plaintiff exercised

15  reasonable diligence in investigating the facts supporting the claim, the standard under § 18

16  presumably is far lower than under the Sarbanes-Oxley statute at issue in *Betz*, which applies

17  only to claims sounding in fraud.  *See* 28 U.S.C. § 1658(b).  Indeed, the Ninth Circuit in *Betz*

18  framed the second step of the inquiry as "whether the plaintiff exercised reasonable diligence in

19  investigating the facts underlying the alleged *fraud*."  *Betz*, 504 F.3d at 1025 (emphasis added).

20  In other words, the question was when the plaintiff "actually discovered that she had a claim

21  against the defendants," including evidence of each element of such a claim.  *Betz*, 504 F.3d at

22  1022.  *Betz*'s relatively high standard for deciding the limitations question as a matter of law

23  was driven primarily by its concern with the plaintiff's heavy burden of discovering facts

24  indicating scienter.  *Betz*, 504 F.3d at 1021-22.  A § 18 claim, by contrast, requires only

25  negligence, meaning that far less is required to alert a potential § 18 claimant of his claim.

26          In the instant case, Plaintiffs base their § 18 claims entirely on alleged misstatements or

27  omissions in Rambus's 2005 10-K form and 2006 proxy statement, filed with the SEC on

28  February 21, 2006, and March 29, 2006, respectively.  As an initial matter, there is no doubt that

16

1    Plaintiffs were on inquiry notice of their § 18 claim long before they filed the instant action.

2    Plaintiffs previously have acknowledged that they became highly suspicious of Rambus's option

3    grants well before the statutory cutoff date, in effect conceding that they had inquiry notice.  *See*

4    Consolidated Amended Complaint ("CAC"), ¶ 125 (stating that 2000 and 2001 losses "caused

5    the Plaintiffs to examine closely the option grants and compensation expenses reported in the

6    2004 and 2005 10-K and the 2004 and 2005 Proxy Statements in making and retaining Rambus

7    securities in 2005 and 2006").  With respect to whether Plaintiffs in the exercise of reasonable

8    diligence should have discovered their claims, Plaintiffs repeatedly have based their allegations

9    of backdating on a simple analysis of the exercise price for options (which was publicly

10   disclosed shortly after each grant), and the price of Rambus stock before and after the grant

11   (which would show that options were being granted at market lows).  *See, e.g.*, Third Amended

12   Complaint, filed May 23, 2007, ¶ 484 (b)-(c); SRCAC ¶ 120 (noting that examination based on

13   the public records indicated that "Rambus was probably backdating").  Based on Plaintiffs' own

14   allegations and judicial admissions, there is nothing to indicate that this analysis could not have

15   been performed–and indeed that it *was not* performed–prior to April 1, 2006, one year before

16   Plaintiffs filed their initial complaint.

17       The Court's Order of April 17, 2008 recognized that Plaintiffs' claims based on SEC

18   filings prior to the one-year cutoff date appeared to be barred by the statute of limitations

19   "because the facts constituting the cause of action were in the public domain."  April 17, 2008

20   Order at 8:18-22.  Only because the Court could not "say with certainty that Plaintiffs could not

21   plead additional facts that would support a claim of delayed discovery" was leave to amend

22   granted.  *Id*.  In their amended pleading and papers opposing the instant motions, Plaintiffs

23   claim only that they were not on inquiry notice, or could not have discovered the facts

24   underlying their claim, until Rambus "*confirmed*" the "material falsity of the financial

25   statements . . . [on] June 27 and July 18, 2006."  SRCAC ¶ 114 (emphasis added); *see also id.* ¶

26   115 (stating that "[t]he specific misrepresentations and omissions that comprise the Section

27   18(a) cause of action were not revealed until Rambus restated it [sic] 2006 Financials on

28   September 14, 2007.").  There is, however, no requirement that backdating be "confirmed"

17

1    before the limitations period runs.  The question is whether reasonable diligence would have

2    revealed the existence of a claim.

3           As the Court already has recognized, and as Plaintiffs' papers make abundantly clear,

4    Plaintiffs are experienced and sophisticated investors.  *See* April 17, 2008 Order at 6:22-28.  In

5    light of that fact, and considering (1) Plaintiffs' prior admissions as to their awareness of the

6    alleged wrongdoing, (2) the Court's prior direction to Plaintiffs to allege facts to support delayed

7    discovery of Defendants' alleged wrongdoing (i.e., that Plaintiffs were *not* on inquiry notice in

8    the first place or, if on notice, conducted a reasonable investigation into the suspected fraud),

9    and (3) Plaintiffs' failure to plead any such relevant facts, there is a strong argument for

10   dismissal of all of Plaintiffs' § 18 claims on limitations grounds alone.  Nonetheless, assuming

11   that the 2005 10-K–the earlier of the two allegedly false documents, filed on February 21,

12   2006–was the first document containing *all* of the information required to put Plaintiffs on

13   notice of their claims, Plaintiffs would have had thirty-eight days within which to identify the

14   facts underlying the claims and file a lawsuit.  Much as in *In re Metropolitan Securities*

15   *Litigation*, 532 F. Supp. 2d 1260 (E.D. Wash. 2007), in which plaintiffs would have had forty-

16   one days between the issuance of reports allegedly triggering their duty to investigate and the

17   cutoff date under the § 18 statute of limitations, it would seem unfair to assume that Plaintiffs

18   could "investigate the compan[y's] . . . problems, hire an attorney, and file a complaint" in such

19   a brief time.  *Id.* at 1288.  For that reason, the Court turns to the merits of Plaintiffs' § 18 claim.

20          **2.        Material misstatements or omissions**

21          Plaintiffs argue that the 2005 10-K and 2006 proxy statements were false in that they

22   omitted disclosure of prior backdating.[9]  The PSLRA requires that Plaintiffs "specify each

23   ─────────────────────

24          [9]Although Plaintiffs appear to rest solely on their allegations that the 2005 10-K and 2006
     proxy statements were false or misleading, the SRCAC is replete with references to "false" Form
25   4 filings by the named defendants.  *See, e.g.*, ¶¶ 57-58, 83.  However, nowhere do Plaintiffs (1)
     explain how these filings are "false" or (2) even assert that they relied on these statements in
26   selling or purchasing securities.  It is possible that Plaintiffs rely on the forms to create a strong
     inference of negligence on the part of defendants Tate, Mooring, and Eulau in issuing the 2005
27   10-K and 2006 proxy statements.  However, because Plaintiffs have not pled the most basic facts
     in connection with the Form 4 allegations–such as their relevance or how they were false–the

28

                                                   18

1    statement alleged to have been misleading, the reason or reasons why the statement is

2    misleading, and, if an allegation regarding the statement or omission is made on information and

3    belief, the complaint [must] . . . state with particularity all facts on which that belief is formed."

4    15 U.S.C. § 78u-4(b)(1).  The Court already has pointed out the absence of an actionable

5    misstatement or omission in the 2006 proxy statement.  *See supra* Section III.B.1.  Plaintiffs

6    attack the 10-K filings by stating the following: (1) "The backdating practices materially

7    affected the income statements, the tax deferred assets, the amount of shareholder equity, the

8    assertions and representations as of adequate internal controls, 162(m) tax deductions for

9    incentive stock option (ISO) grants and executive compensation disclosures by grants in each of

10   the Rambus' [sic] 10-K statements which were all materially false because in violation of

11   Generally Accepted Accounting Principles (GAAP), the defendants, inter alia, understated

12   expenses for the reporting period by failing to expense the in-the-money amount of the

13   backdated grants,"  SRCAC ¶ 33; (2) "Each 10-Q and 10-K filed during 2004, 2005 and 2006

14   incorporate [sic] the financial statements from the preceding two years and each was materially

15   misstated and omitted material disclosures because of the Defendants' prior backdating

16   practices," SRCAC ¶ 36; and (3) "[The 2005 10-K] . . . showed a further improvement in the

17   SFAS 123 pro forma net income to $3,056,000. . . . In fact, the restatement shows that Rambus

18   suffered another net loss of $9,003,000 for the year and that this statement that Plaintiffs relied

19   on was materially false. . . .  In 2004 and 2005, Rambus actually lost over $20 million while

20   reporting that it had earned $2.6 million."  SRCAC ¶¶ 112-13.

21          Neither of the first two statements offers any specific facts supporting Plaintiffs' claim of

22   alleged deviations from accounting standards.  The third statement, however, does point to a

23   specific alleged discrepancy between Rambus's stated and actual financial condition.  Plaintiffs

24   allege that this discrepancy resulted from the extensive pattern of backdating at Rambus.

25   Indeed, Rambus does not even attempt to argue that the 2006 10-K did not contain false

26   statements.  *See* Rambus Mot. to Dismiss, at 17:5-25:6 (arguing failure of Plaintiffs' § 18 claim,

27   

28   Court will not consider the allegations.

19

1    but declining to dispute the existence of material misstatements or omissions in the 2006 10-K).

2            As to PwC, Plaintiffs allege (1) that PwC's audit opinions with respect to Rambus's

3    financial statements and internal controls were false and misleading, and (2) that PwC is

4    responsible for errors in Rambus's financial statements.  Regarding Plaintiffs' second

5    contention, outside auditors may not be held liable under § 18(a) for misstatements in the

6    company's financial statements that were certified by the auditor.  This is because "auditors do

7    not 'certify' a company's financial statements in the sense that they 'guarantee' or 'insure' them.

8    Nor do they, by virtue of auditing a company's financial statements, somehow make, own or

9    adopt the assertions contained therein."  *Deephaven Private Placement Trading Ltd, v. Grant*

10   *Thornton & Co.*, 454 F.3d 1168, 1174 (10th Cir. 2006).  With respect to their first contention,

11   Plaintiffs generally must argue either (1) that PwC did not believe its audit opinions were true,

12   or (2) that it did not have a reasonable basis for its audit opinions.  *See Deephaven*, 454 F.3d at

13   1176.

14           Plaintiffs rely exclusively on a theory that PwC lacked a reasonable basis for its

15   opinions.  *See* Pls.' Opp. to PwC Mot. to Dismiss, ¶ 49 ("Plaintiffs have not alleged that PWC

16   disbelieved their own audit and internal control opinions.  Plaintiffs here have alleged that PWC

17   had no reasonable basis for its opinion.").  They argue in essence that PwC did not recognize

18   "any material weakness in Rambus [sic] internal controls at any time from 1998 into 2006

19   despite grievous control problems in the stock compensation accounting."  Plaintiffs' Opp. to

20   PwC Mot. to Dismiss, at 6:18-22.  Plaintiffs point to a series of alleged GAAS and GAAP

21   violations, including PwC's failure to detect overlapping Audit Committee and Compensation

22   Committee conflicts of interest, SRCAC ¶ 95, and failure to discover that Rambus did not

23   amortize compensation costs ratably over the vesting period, as required by the then-applicable

24   APB 25 stock options accounting standard–all amounting essentially to a "failure to audit the

25   single largest expense of the company, i.e., the stock and option grants," SRCAC ¶¶ 101-02.

26           As already noted, Plaintiffs have alleged a "uniform course of fraudulent conduct" such

27   that Rule 9(b) applies to all of the allegations.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097,

28   1103-04 (9th Cir. 2003).  PwC is correct that none of the allegations is sufficiently particularized

                                                    20

1   to meet that standard.  Plaintiffs do not "link the subsequent restatement of [Rambus's] financial

2   statements with any facts available during the audit that could have alerted [PwC] to the

3   inaccuracies in the information furnished by [Rambus], and thus fail[] to provide particular facts

4   to suggest that PwC actually committed a GAAS violation." *Reiger v. Altris Software, Inc.*, No.

5   98-528-TW, 1999 WL 540893, at *7 (S.D. Cal. Apr. 30, 1999), *aff'd sub nom. DSAM Global*

6   *Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002).  However, as discussed

7   earlier, Plaintiffs' failure to comply with Rule 9(b) does not end the inquiry.  "Where averments

8   of fraud are made in a claim in which fraud is not an element, an inadequate averment of fraud

9   does not mean that no claim has been stated.  The proper route is to disregard averments of fraud

10   not meeting Rule 9(b)'s standard and then ask whether a claim has been stated." *Vess*, 317 F.3d

11   at 1105 (quotation marks and citation omitted).  Viewing the claims under a negligence standard

12   and drawing all inferences in Plaintiffs' favor, the combination of red flags and the sheer

13   magnitude of the ultimate restatement of Rambus's 2006 10-K could be read to suggest that

14   PwC lacked a reasonable basis for its audits.

15           **3.      Strong inference of negligence**

16           As explained above in Section III.A, § 18 requires "something more than negligence."

17   *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 211 n.31 (1976).  It does so, however, by giving

18   Defendants the opportunity to plead that they acted "in good faith and had no knowledge that [a]

19   statement was false or misleading." 15 U.S.C. § 78r(a).  Plaintiffs initially are required to plead

20   no more than facts giving rise to a strong inference of negligence.  *See, e.g., Magna Inv. Corp. v.*

21   *John Does One Through Two Hundred*, 931 F.2d 38, 39-40 (11th Cir. 1991); *In re Alstom* SA,

22   406 F. Supp. 2d 402, 420 (S.D.N.Y. 2005).  The Court therefore rejects without further

23   discussion Defendants' argument that Plaintiffs' claim fails because it pleads only negligence.

24   *See, e.g.*, Tate Mot. to Dismiss, at 6:20-7:8; Rambus Mot. to Dismiss, at 13:17-14:8.  Because

25   this action is at the pleading stage, Plaintiffs have no duty to anticipate and rebut such a defense.

26           In other respects, the PSLRA's "strong inference" requirement for a § 18 claim is similar

27   to that for a § 14 claim.  As noted in the § 14 context, several courts have shown a willingness to

28   treat corporate signatures or positions as sufficient to support liability under § 18.  *See, e.g.*,

1    *Enron*, 540 F. Supp. 2d 800, 813-14 (S.D. Tex. 2007) (noting that "liability may be imposed on

2    the issuer's officers and directors, in particular those who sign the filed documents") (citing

3    *Kramer v. Scientific Control Corp.*, 452 F. Supp. 812, 817 (E.D. Pa. 1978) (holding that the

4    "fact [of defendants' service as directors on the effective date of the registration statement]

5    alone, if proved, would subject each to liability based upon § 18")).  Moreover, consistent with

6    the rule that "a series of less precise allegations [may] be read together to meet the PSLRA

7    requirement[s]," *South Ferry LP, No. 2 v. Killinger*, 2008 WL 4138237, at *5 (9th Cir. 2008),

8    courts have inferred mental states as high as scienter based on a combination of defendants'

9    positions, the magnitude of the alleged wrongdoing, and the common wisdom that "books do

10   not cook themselves," *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273

11   (N.D. Cal. 2000).  *See, e.g.*, *Communications Workers of America Plan for Employees' Pensions*

12   *and Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1124-25 (D. Ariz. 2007) ("The

13   widespread problems at [the company] may have resulted from poor management, but it appears

14   equally plausible that [defendants] possessed the deliberate recklessness or fraudulent intent

15   necessary for scienter in this circuit."); *Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS,

16   2008 WL 2676364, at *13 (C.D. Cal. July 1, 2008) (holding that "significant violations of

17   GAAP, [if] taking place over an extended period of time, give rise to a strong inference of

18   scienter); *In re LDK Solar Securities Litigation*, No. C 07-05182 WHA, 2008 WL 2242185, at

19   *12 (N.D. Cal. May 29, 2008) (following logic of *CSK Auto Corp.*, *supra*, in light of *Tellabs*).

20        The Court already has concluded that the allegations of a misstatement or omission in

21   the 2006 proxy statement are insufficient to state a claim.  However, the circumstances

22   surrounding the alleged misstatements and omissions in the 2005 10-K do establish a strong

23   inference of defendants' negligence.  First, the 2005 10-K was signed by defendants Eulau, Tate,

24   Dunlevie, Farmwald, and Mooring.  *See* Motion for Judicial Notice, Doc. No. 91, Ex. 5, at 84.

25   As the *Enron* Court held, "the rational of *Howard*[, holding corporate officials accountable for

26   statements they sign], supports imposition of liability under § 18 on directors who sign the

27   corporation's Forms 10-K."  *Enron*, 540 F. Supp. 2d at 814 (citing *Howard*, 228 F.3d at 1061).

28   Plaintiffs also have alleged the receipt of multiple and large backdated options grants by Tate,

22

1   SRCAC ¶¶ 28, 63, 123, 124, Eulau, SRCAC ¶¶ 48, 63, 123, 124, and Mooring, SRCAC ¶ 63,

2   123, 124, during their tenure as directors and officers, and direct involvement in the

3   authorization of the grants by Tate, SRCAC ¶¶ 39, 58, 65, 69, 76, Eulau, SRCAC ¶ 61,

4   Davidow, SRCAC ¶¶ 40, 59, 62, 64, 67, 71, 74, Dunlevie, SRCAC ¶¶ 40, 59, 62, 64, 67, 71, 74,

5   and Farmwald, SRCAC ¶¶ 40, 56, 59.  *See also* SRCAC, Ex. B-14 (showing membership over

6   time of committees responsible for alleged backdating).  "The inquiry . . . is whether all of the

7   facts alleged, taken collectively, give rise to a strong inference of [the requisite mental state], not

8   whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 127

9   S.Ct. at 2509.  Given the magnitude and extent of the problems at Rambus, Defendants' key

10  positions in the company, and their alleged involvement in the granting and receipt of backdated

11  options, even several years before the alleged misstatements or omissions, it would strain

12  credulity to say that Defendants would not have been at least negligent in failing to detect and

13  disclose the vast diversion of cash allegedly accomplished by the backdating.  *See Berson v.*

14  *Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008) (finding strong inference of

15  *scienter* based on defendants' corporate positions because it was "hard to believe that they

16  would not have known about [actions] that allegedly halted tens of millions of dollars of the

17  company's work").

18      **4**. **Actual Reliance**

19          A § 18 claimant must allege actual reliance on the relevant misstatements or omissions

20  in purchasing or selling a security, and may not allege constructive or presumed reliance.

21  *Howard*, 228 F.3d at 1063; *In re Redback Networks, Inc. Sec. Litig.*, No. CO3-5642JF (HRL),

22  2007 WL 963958, at *7 (N.D. Cal. Mar. 30, 2007).  Conclusory assertions of reliance are

23  insufficient, and plaintiffs must "plead facts probative of their actual reliance on any specific

24  false statement" in the filings at issue.  *In re. Supreme Specialties, Inc., Sec. Litig.*, 438 F.3d

25  256, 284 (3d Cir. 2006).  Statements to the effect that plaintiffs "received, reviewed, actually

26  read, and relied upon" certain financial documents, or "actually read and relied upon [them] in

27  making their decisions to invest in [company] common stock," are inadequate.  *Suprema*

28  *Specialties*, 438 F.3d at 284.  Finally, a § 18(a) plaintiff must affirmatively allege that such

                                                  23

1   reliance occurred "when he *bought or sold* the security at issue."  *Ravenswood Inv. Co. v.*

2   *Bishop Capital Corp.*, 374 F. Supp. 2d 1055, 1064 (D. Wy. 2005) (emphasis added).

3          With respect to the 2005 10-K, Plaintiffs state only that "Douglas Kelley and James

4   Kelley read the 2005 10-K filed on February 21, 2006 and it showed a further improvement in

5   the SFAS pro forma net income to $3,056,000.  Plaintiff relied on this 10-K data, inter alia, in

6   maintaining investment in Rambus securities."  SRCAC ¶ 112.  Because Plaintiffs make no

7   attempt anywhere in the complaint to explain the relevance of the figures in these statements, or

8   how they were false, the statements are of the kind rejected by the Third Circuit in *Suprema*

9   *Specialties*.  In addition, because Plaintiffs must show reliance during the sale or purchase of a

10  security, their *maintenance* of Rambus securities is irrelevant for § 18(a) purposes.  Plaintiffs'

11  opposition papers confirm the absence of any actual reliance.  There, under the heading

12  "Evidence of Actual and Presumed Reliance," Plaintiffs offer nothing but a theory of presumed

13  reliance.  Plaintiffs' Opp. to Rambus Mot. to Dismiss, at 20-21.  This theory is directly at odds

14  with Ninth Circuit authority.  *See Howard*, 228 F.3d at 1063 (holding that actual reliance is

15  required under § 18).

16         Plaintiffs also have submitted "selected pages from Rambus's 2005 Annual Report, sent

17  to me [James Kelley] prior to the 2005 Annual Shareholders Meeting," which pages "show

18  annotations in my hand, which I made contemporaneously as I read and evaluated Rambus' 10K

19  [sic] and Proxy Statements incorporated in the same 2005 Annual Report."  Decl. of James

20  Kelley, at 2:9-15.[10]  These pages contain circles and underlining, including with respect to the

21  issuance of options.  However, Plaintiffs do not allege when they read any of these documents,

22  or whether and how they relied on them in any way in the sale or purchase of a security.  Each of

23  these details is a prerequisite to the Court's attribution of any meaning to the annotated

24  documents.

25         Plaintiffs' deficient allegations and evidence of reliance are consistent with other

26  patterns affirmatively indicating a lack of reliance on Rambus's financial or proxy statements.

27

28         [10] These documents accompany Plaintiffs' replies the instant motions to dismiss.

24

1  As the Court previously found, the assertion that Plaintiffs relied on the 2005 10-K statement is

2  "belied by [their] averment that 'earlier losses [in 2000 and 2001] caused the Plaintiffs to

3  examine closely the options grants and compensation expenses reported in the 2004 and 2005

4  10-K and the 2004 and 2005 Proxy Statements in making and retaining Rambus securities in

5  2005 and 2006.'"  April 17, 2008 Order at 6:22-28.  Indeed, Plaintiffs appear to be "day traders

6  who sought to profit from the short term volatility in Rambus's stock price."  *Id.*  In addition,

7  Plaintiffs appear to have held short positions on Rambus stock between 2004 and 2006, SRCAC

8  ¶ 144, casting serious doubt on their purported reliance on the market price of that stock or the

9  company's financial or proxy statements.[11]  The foregoing facts, combined with Plaintiffs'

10  inadequate affirmative assertions of reliance, require dismissal of Plaintiffs' § 18 claims for lack

11  of actual reliance.

12  **5**. **Loss Causation**

13  Loss causation requires that the plaintiff "demonstrate a causal connection between the

14  deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the

15  plaintiff."  *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055-56 (9th Cir. 2008).  Plaintiffs

16  must allege that the price of the stock in question was affected by the alleged misrepresentation

17  or omission at the time plaintiffs bought or sold that stock.  *See* 15 U.S.C. § 78(r)(a); *Erath v.*

18  *Xidex Corp.*, No. CIV-89-198TUCACM, 1991 WL 338322, at *11 (D. Ariz. Feb. 7, 1991)

19  (noting that "under § 18(a) the price plaintiff paid must have been affected by the misleading

20  statement").  The misrepresentation "need not be the sole reason for the decline in value of the

21  securities, but it must be a 'substantial cause.'"  *In re Gilead*, 536 F.3d at 1055-56 (internal

22  quotation marks omitted).  In general, "[s]o long as the complaint alleges facts that, if taken as

23  true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate."  *Id*.

24  In the April 17, 2008 Order, the Court noted that "Plaintiffs ha[d] yet to allege loss

25  causation adequately in any of their multiple and voluminous pleadings, [and that] their claims

26  ───────────

27  [11] Plaintiffs respond by asserting that the "Rambus Defendants falsely characterize
Plaintiffs [sic] investments as short position [sic] from 2004-2006," Plaintiffs' Opp. to Rambus

28  Mot. to Dismiss, at 17:5-6, but their own pleadings establish this fact.

25

1  [were] subject to dismissal for this reason alone." Order at 4:17-23.  In their current pleadings,

2  Plaintiffs have alleged several loss-causative events that, viewed in isolation, might present a

3  plausible causal chain.  With respect to their alleged 2006 losses, Plaintiffs appear to claim that

4  Rambus's stock price was inflated due to backdating concealed in the 2005 10-K, that the

5  issuance of the Center for Financial Research report concerning companies suspected of

6  backdating precipitated a decline in Rambus's stock price (albeit not an immediate decline) that

7  continued with further revelations of backdating, and that Plaintiffs' suffered losses as a result.

8  Plaintiffs also have alleged–although in completely cursory fashion–that the price of certain

9  stocks they purchased in 2005 was materially affected by the failure to disclose the backdating.

10 *See* SRCAC ¶ 175 & Ex. L-4.  While Defendants argue that this causal chain is undermined by

11 Plaintiffs' acknowledgment that Rambus's stock price was "greatly inflated in 2006 because

12 Rambus won a spoliation trial, announced new contracts and entered a patent infringement trial

13 that they were expected to win," SRCAC ¶ 139, the alleged misrepresentation and subsequent

14 correction need only be a "substantial cause" of the alleged loss.  *In re Gilead*, 536 F.3d at 1055-

15 56.  Moreover, the apparent lack of downward price movement immediately after Rambus filed

16 its 2005 10-K does not necessarily destroy the causal chain.  *See id.* at 1057-58.

17         Nonetheless, the Court previously has noted numerous internal inconsistencies in

18 Plaintiffs' loss causation arguments, particularly with respect to the purported corrective

19 disclosures.  A review of the SRCAC reveals that the inconsistencies remain, and Plaintiffs'

20 theory of a corrective disclosure continues to shift.  For example, with respect to their alleged

21 losses in 2006, Plaintiffs previously contended that their first loss occurred on April 21, 2006,

22 following a disappointing earnings report on April 19, 2006, CAC ¶ 121, but they now tie their

23 losses to the release of the CFRA report on May 16, 2006, SRCAC ¶ 140.  Plaintiffs' latest

24 theory–again asserted only in their opposition papers–is that they "were damaged by the

25 prospect of a further 10% capital stock dilution as evidenced by the $ 7 decline in Rambus stock

26 price from May 10, 2006 (when the solicitations were passed)."  SRCAC ¶ 82.  There is "an

27 element of the theory of the day" with respect to the alleged corrective disclosures, *see*

28 Statement of Counsel for Rambus, Transcript of September 12, 2008 Hearing, Doc. 259, at 20:1,

26

1    and these theories, when taken together, are anything but coherent or plausible.  Critically,

2    Plaintiffs have not alleged with any clarity that securities they bought or sold were affected by

3    the alleged misstatements or omissions.  Ultimately, Plaintiffs must identify securities (1) whose

4    price was affected by specific misstatements or omissions in the 2005 10-K, (2) upon which

5    Plaintiffs actually relied, (3) in purchasing or selling such securities, (4) which securities

6    subsequently were affected by a corrective disclosure, (5) causing Plaintiffs to suffer losses.

7    Plaintiffs have failed once again to allege any such causal chain.

8                                    **IV. CONCLUSION**

9            Having thoroughly reviewed Plaintiffs' Second (Revised) Consolidated Amended

10   Complaint with respect to each element of the claims, the Court concludes that Plaintiffs cannot

11   state a claim under § 14 of the Exchange Act, and that no additional amendment could save that

12   claim.  Even assuming that Plaintiffs could show that their § 14 claim is direct in nature and

13   could cure their defective allegations with respect to misstatements in the 2005 proxy statement

14   by providing particularized evidence of backdating in 2004, their theory would create an

15   insoluble logical conflict with the essential link requirement.  With respect to the § 18 claim,

16   Plaintiffs' apparent lack of reliance is evidenced not merely by their repeated failure adequately

17   to plead actual reliance–and their corresponding insistence upon an impermissible theory of

18   presumed reliance–but by the seemingly intractable contradictions that plague those allegations

19   they do offer.  Similarly with respect to loss causation, Plaintiffs' inability to settle on a

20   corrective disclosure–and the inconsistency among the disclosures they allege–indicates the lack

21   of a causal relationship between the alleged misstatements and omissions and any actual loss.

22   For these reasons, Defendants' motions to dismiss will be granted.

23           In assessing whether Plaintiffs once again should be given leave to amend, the Court

24   must consider "the presence or absence of undue delay, bad faith, dilatory motive, repeated

25   failure to cure deficiencies by previous amendments, undue prejudice to the opposing party[,]

26   and futility of the proposed amendment."  *Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048,

27   1052 (9th Cir. 2001) (quoting *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 538 (9th Cir.

28   1989)); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) (providing factors constraining

                                           27

1    district court's discretion to deny leave to amend).  These factors, however, are "not given equal

2    weight . . . , [and] futility of amendment can, by itself, justify the denial of a motion for leave to

3    amend."  *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).

4           While there is no evidence that Plaintiffs have been guilty of undue delay, bad faith, or

5    dilatory motive, it should be clear from the Court's discussion that amendment of the § 14 claim

6    necessarily would be futile.  With respect to the § 18 claim, the Court is convinced that while

7    there may have been wrongdoing at Rambus, Plaintiffs did not rely on that wrongdoing in

8    purchasing or selling any securities and therefore are not within the class of persons protected by

9    the statute.  Corporate wrongdoing may well provide ample fodder for allegations of negligent

10   misstatements and omissions, but § 18's reliance and loss causation requirements ensure that

11   only those directly harmed by the alleged misstatements or omissions may recover.  Plaintiffs

12   long have been aware of the requirement that they plead actual reliance, *see*, *e.g.*, Transcript of

13   Hearing, Sept. 12, 2008 (containing Plaintiffs' claim to have demonstrated actual reliance);

14   Rambus Reply ISO Mot. to Dismiss, filed Jan. 4, 2008, at 10:15-17 (referring Plaintiffs to Ninth

15   Circuit holding in *Howard*, 228 F.3d at 1063, that § 18 claimants must allege *actual*, as opposed

16   to presumed, reliance); PwC Mot. to Dismiss, filed Dec. 30, 2007, at 14:9-15:9 (explaining

17   actual reliance requirement in light of *Howard*),[12] and of the Court's concern that their

18   contradictory allegations *precluded* a finding of such reliance, *see* Order at 6:22-28 (discussing

19   contradictory nature of Plaintiffs' allegations of reliance), but still have not cured this deficiency

20   in the *tenth* iteration of their complaint.[13]  Plaintiffs also have received extensive guidance from

21   the Court with respect to the requirements of loss causation,[14] but they still have not alleged that

22

23         _____

24         [12] Plaintiffs also were informed explicitly of the requirement that they allege actual
     reliance at a motion hearing held on March 14, 2008.

25         [13] Several of these pleadings, including Plaintiffs' second and third amended complaints,
26   were not authorized by the Court.

27         [14] Not only have Defendants provided citation to all of the relevant authorities on loss
     causation, but the Court offered a thorough discussion on the subject during the March 14, 2008
28   motion hearing and in the April 17, 2008 Order.

                                              28

they relied on the purported misstatements or omissions in *purchasing or selling* a security

whose price was *affected* by the alleged misstatements or omissions.  Indeed, Plaintiffs have

stated only that they "maintained" such securities, which cannot be the basis of a plausible loss

causation theory.

In addition to the apparent futility of permitting Plaintiffs to amend their claims, the

Court must consider the very real prejudice that defendants have suffered and will continue to

suffer if leave to amend is granted.  Throughout this litigation, each of Plaintiffs' filings has

required Defendants to sift through an enormous volume of highly disorganized material in an

attempt to identify relevant facts and legal theories.  In dismissing an early version of the

complaint for failure to comply with Federal Rule of Civil Procedure 8(a), the Court agreed with

Defendants that the complaint, with its 735 paragraphs and extensive requests for judicial

notice, amounted to no more than a 1,137-page "morass of allegations . . . . [l]oaded with

multiple theories of conspiracies." Order of October 15, 2007, at 3:3-7.  In the Order dated

April 17, 2008, the Court again noted that "many of Plaintiffs' allegations are confusing and/or

internally inconsistent, [such that] both Defendants and the Court have been limited severely in

attempting to address the substantive adequacy [of the claims] . . . . [As a result], each of the

Defendants has suffered substantial prejudice by having to pay lawyers to read, attempt to

understand[,] and respond to Plaintiffs' allegations." Order at 10:19-24.  As the foregoing

discussion indicates, numerous factual inconsistencies in Plaintiffs' § 18 allegations suggest that

no amendment would permit them *truthfully* to plead actual reliance or loss causation.  Even

accepting that there is at least a theoretical possibility that Plaintiffs could do so given further

leave to amend, the Court finds that such a possibility is outweighed by the continuing prejudice

that Defendants undoubtedly would suffer as a result.  For these reasons, leave to amend will be

denied, and judgment will be entered for Defendants.[15]

---

[15] At the September 12, 2008 hearing on the instant motions to dismiss, Plaintiffs alerted the Court to new information allegedly revealing that Rambus's internal auditor notified the company and PwC of severe internal control deficiencies with respect to options accounting.  *See* Transcript of September 12, 2008 Hearing, Doc. No. 259, at 12:6-23.  Given the Court's

1

2   **IT IS SO ORDERED.**

3

4   DATED: 12/9/08

5

6                                              _____
                                               JEREMY FOGEL
7                                              United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

_____

23   determination that Plaintiffs adequately have pled (1) PwC's negligent failure to provide a

24   reasonable basis for its audit opinions, and (2) the negligence of the other named Defendants
     with respect to the management and disclosure of the options grant process, the Court does not
25   believe that this information materially affects its disposition.  Plaintiffs also have filed what they
     consider evidence of wrongdoing that would support certain claims previously dismissed with
26   prejudice by this Court.  *See* Declaration of James Kelley, filed Nov. 16, 2008 (noting existence
     of new evidence).  With respect to this evidence, the Court offers no opinion as to whether
27   Plaintiffs successfully might seek relief from the judgment pursuant to Federal Rules of Civil
     Procedure 59(e) or 60(b).
28

30

Case No. C 07-1238 JF (HRL)
ORDER GRANTING MOTIONS TO DISMISS
(JFLC3)

1   This Order has been served electronically upon the following persons:

2   Alexander Louis Karpman akarpman@irell.com

3   Anthony I. Fenwick anthony.fenwick@dpw.com, angela.quach@dpw.com,

4   ecf.ct.papers@dpw.com

5   Brooke Ashley Grossman brooke.russakoff@dpw.com

6   Darryl Paul Rains drains@mofo.com, dgillis@mofo.com

7   David Siegel dsiegel@irell.com

8   Donald P. Gagliardi dgagliardi@be-law.com, emtofelogo@be-law.com

9   Douglas B Kelley yusfdbk@yahoo.com

10  Felix Shih-Young Lee flee@fenwick.com

11  Garland Aycuff Kelley GKelley@irell.com

12  Ignacio Evaristo Salceda isalceda@wsgr.com, rlustan@wsgr.com

13  James H.R. Windels james.windels@dpw.com

14  Jay L. Pomerantz jpomerantz@fenwick.com, slim@fenwick.com

15  Jill R. Zimmerman jill.zimmerman@dpw.com, brooke.russakoff@dpw.com,

16  nanci.salyer@dpw.com

17  John Charles Hueston jhueston@irell.com

18  Jonathan R. Bass EfilingJRB@cpdb.com, aaa@cpdb.com, mjc@cpdb.com

19  Justin S. Chang jchang@shearman.com, rcheatham@shearman.com

20  M. Elizabeth Parr elizabeth.parr@dpw.com

21  Martin N. Gelfand mgelfand@irell.com

22  Stephanie Laura Zeller szeller@mofo.com, llontayao@mofo.com

23  Steve Shea Kaufhold skaufhold@akingump.com, sgagnon@akingump.com

24  Susan Samuels Muck smuck@fenwick.com, cgalvin@fenwick.com

25

26

27

28

Case No. C 07-1238 JF (HRL)
ORDER GRANTING MOTIONS TO DISMISS
(JFLC3)

1    This Order has been served by other means upon the following persons:

2    James M Kelley
     14390 Douglass Lane
3    Saratoga, CA 95070

4    Miki W. Larsson
     14390 Douglass Lane
5    Saratoga, CA 95070

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 07-1238 JF (HRL)
ORDER GRANTING MOTIONS TO DISMISS
(JFLC3)